**BOARD OF EDUCATION OF BOONE COUNTY, Kentucky, Appellant,**

v.

**Joan BUSHEE, et al., Appellees.**

**No. 93–SC–980–DG.**

Supreme Court of Kentucky.

Dec. 22, 1994.

**810**

Robert F. Chenoweth, John C. Fogle, III, Frankfort, Gerald F. Dusing, Florence, for appellant.

David Yewell, Owensboro, for amicus curiae Kentucky School Boards Ass'n.

Ron L. Walker, Jr., Arthur L. Brooks, Lexington, for appellees.

STEPHENS, Chief Justice.

This appeal concerns the intent of the legislature when it delegated decision-making authority to both local school boards and individual school councils in enacting the Kentucky Educational Reform Act [hereinafter "KERA"]. The parties question the scope of each group's delegated authority. To be more specific, the parties ask to what extent can the school council operate as an autonomous decision making body?

The appellees, who include officers of the Boone County Education Association and a teacher in the Boone County School system [hereinafter "the Council"], filed a declaratory judgment action against appellant, the Boone County Board of Education [hereinafter "the Board"], challenging a portion of the Board's policy created to meet statutory requirements. KRS 160.345 requires that each "local board of education shall adopt a policy for implementing school-based decision making" that addresses and complies with the additional requirement that each school form a council that has "the responsibility to set school policy consistent with district board policy...." KRS 160.345.

The specific provision of the Board's policy in question reads:

> By each September Board of Education meeting, each council shall submit in writing for Board review and *approval* the following:
>
> 1. Measurable goals and objectives for the school year. The goals shall be related to the goals listed in HB 940, Part 1, Section 2 and 3.[1]
>
> 2. Implementation plan for achieving its goals and objectives.
>
> 3. Method of evaluating the effectiveness of the implementation plan.
>
> (emphasis added).

The Council contends this provision of the Board's policy invades the province of the school councils as envisioned by the legislature when pursuing the broad educational

---

1. HB 940, Part 1, Subsections 2 and 3 refer to the now codified KRS 158.645 and 158.6451 that set forth the seven capacities students in Kentucky are expected to acquire and the goals and objectives to be achieved by students in Kentucky schools.

reforms of KERA. The Council argues that the required Board approval of these enumerated responsibilities essentially usurps the Council of the authority delegated to it by the legislature to act as an independent decision making body. The trial court held that the Board's policy did not overstep its statutory authority. The Court of Appeals reversed. We affirm the result reached by the Court of Appeals but believe our understanding of KERA to be different than that expressed by that Court. This opinion will attempt to clarify the designated participatory roles for each contributor to the public education system.

█ Before we address the substantive issue of delegated authority, however, we must first consider whether there exists a justiciable controversy. The Board contends that because no specific policy or request has been submitted for approval by the Council, there is no present controversy over rights or liabilities.

In a declaratory judgment action, it has been well recognized by this court that the question is not one of a present controversy as contended by the Board, but rather whether there is a *"justiciable controversy* over present rights, duties or liabilities." *Dravo v. Liberty Nat. Bank & Trust Co.*, 267 S.W.2d 95, 97 (1954) (emphasis added). "This is so although the effect of the judgment is prospective." *Id.* In this case, upon submission of the request as required by the Board policy, there will be either approval or disapproval by the Board. This in itself is the justiciable controversy; whether this approval can be required at all. The result of the Board's decision to approve or disapprove would have no effect upon the ability to require the approval in the first place. As a result, we do not feel unable to address this present justiciable issue before an act of approval or disapproval occurs.

We turn now to the question of delegated authority. To address this issue we believe it would first be helpful to consider the historical background leading to the enactment of KERA. The General Assembly enacted KERA following this court's decision in *Rose v. Council for Better Education, Inc.*, Ky., 790 S.W.2d 186 (1989). In that opinion, we

found that the former legislative framework did not provide an efficient common school system as guaranteed by the Kentucky Constitution. As a result, we directed that the General Assembly "recreate and redesign a new system that will comply with standards we ... set out." *Id.*

These standards included the following:

(1) The *establishment, maintenance, and funding* of common schools in Kentucky is the *sole responsibility of the General Assembly,* and

. . . . .

(6) Common schools shall be monitored by the General Assembly to assure that they are operated with no waste, no duplication, no mismanagement, and with no political influence. *Id.* at 212–3.

We also found in *Rose* that the General Assembly could "choose to delegate any of [its responsibility to provide a common school system] ... to institutions such as the local boards of education." *Id.* at 216. It is important to recognize these holdings because they provided the impetus for KERA, and they enable us to place the statutory provisions in question today within their relevant context.

The crux of the *Rose* decision rested upon inefficiencies in the common school system created by "improper nepotism, favoritism, and misallocation of school monies." *Id.* at 193. In addressing these issues, KERA guarantees that the responsibility for providing the financial means necessary to provide a common school system rests with the General Assembly. KERA also maintains accountability for potential problems with respect to these issues at the level of the General Assembly. On the other hand, KERA ensures active and meaningful participation on the part of teachers, parents, and students, recognizing that these are aspects of education that do not necessitate statewide control.

The General Assembly's statutory approach to "eliminat[ing] areas which were once fertile ground for favoritism and/or nepotism to take root" has been addressed by this court in *Chapman v. Gorman*, Ky., 839

S.W.2d 232, 235 (1992). In the case sub judice, we address which duties the General Assembly chose to delegate to other decision making bodies, while retaining statewide control of the allocation of school funds and accountability for the overall success of the state common school system.

■ To understand how these distributions of authority were schematically organized, we turn to the statutes to review the provisions of KERA to define its overall objectives. Pervasive throughout all pertinent provisions, when considered as a whole statutory framework, is one important theme. The essential strategic point of KERA is the decentralization of decision making authority so as to involve all participants in the school system, affording each the opportunity to contribute actively to the educational process. The language of KRS 158.645 overwhelmingly reflects this intention:

> The General Assembly recognizes that public education involves *shared responsibilities.* State government, local communities, parents, students, and school employees must work together to create an efficient public school system.... The cooperation of all involved is necessary to assure that desired outcomes are achieved. (emphasis added).

■ The remaining statutory provisions set out the structural framework by which this decentralization of decision making authority is to occur. These statutory provisions instruct all participating groups: state government, local communities, parents, students and school employees, as to their delegated responsibilities and how they are to interface with the other participating groups.

We will begin with the first contributor to the educational process. First, KRS 158.6451 addresses the responsibilities of state government. As suggested in *Rose,* these include the accountability of funds and the obligation of ensuring that the objectives as to learning capacities are achieved in all schools of the Commonwealth. As was appropriately recognized by the General Assembly, these are interests inherently best represented by a body composed of members representing statewide, as well as local, interests.

Originally the Council on School Performance Standards, which was established by Executive Order 89–151, was charged with the responsibility of framing the goals for all public schools of the Commonwealth in measurable terms. KRS 158.6451. These six goals read as follows:

(a) Schools shall expect a high level of achievement of all students.

(b) Schools shall develop their students' ability to:

1. Use basic communication and mathematics skills for purposes and situations they will encounter throughout their lives;

2. Apply core concepts and principles from mathematics, the sciences, the arts, the humanities, social studies, and practical living studies to situations they will encounter throughout their lives;

3. Become a self-sufficient individual;

4. Become responsible members of a family, work group, or community, including demonstrating effectiveness in community service;

5. Think and solve problems in school situations and in a variety of situations they will encounter in life; and

6. Connect and integrate experiences and new knowledge from all subject matter fields with what they have previously learned and build on past learning experiences to acquire new information through various media sources.

(c) Schools shall increase their students' rate of school attendance.

(d) Schools shall reduce their students' dropout and retention rates.

(e) Schools shall reduce physical and mental health barriers to learning.

(f) Schools shall be measured on the proportion of students who make a successful transition to work, post-secondary education, and the military.

Each of these objectives is broadly defined, noticeably lacking in any procedural requirements for the achievement of these goals. Rather, the General Assembly delegated the State Council the responsibility of developing a measurement system to enable the success-

es of the reforms occurring on the local level to be ascertained. KRS 158.6451(1).

On the submission of its final report, the State Council ceased to exist, and the State Board of Education adopted the goals of the State Council pursuant to KRS 158.6451(3). The State Board is the current participant in the statewide educational program, representing state government's interests and charged with its responsibilities.

At the termination of the State Council's existence, the State Board of Education was also charged with "disseminat[ing] to local school districts and schools a *model* curriculum framework ... that provid[ed] *direction* to local districts and schools as *they* develop[ed] *their* curriculum." KRS 158.6451(4) (emphasis added). This language illustrates that the legislature did not intend the State Board to have absolute authority over the actions of the local school boards and/or school councils. It is clear that the General Assembly required that a model curriculum be *provided to* the local schools' boards and school councils that would provide guidance only, not specific rules to be followed or actions to be taken in developing a curriculum. The local districts and schools have been delegated the authority and responsibility for developing their own curriculums, notwithstanding the content of the model curriculum. The only limitation at this point in developing their curriculums is that the goals outlined by the State Council be the objectives of the resulting plan.

Other responsibilities of the State Board are directed in KRS 158.6453. These directives primarily focus on the need for statewide assessment of the achievements of each local institution in terms of the stated statewide objectives. These reflect the need for statewide accountability for achievement of outlined objectives. The statute reads:

The State Board for Elementary and Secondary Education shall be responsible for creating and implementing a statewide, primarily performance-based assessment program to insure school accountability for student achievement of the goals set forth.... The Board shall also be responsible for administering an interim testing program to assess student grades four (4), eight (8), and twelve (12). The tests shall be designed to provide the state with national comparisons .... KRS 158.6451(1).

These responsibilities clearly reflect that area of education that most effectively rests at the statewide level. In order to assess the overall success of the educational reforms, the legislature recognized that it is imperative that a body representing statewide interests be held accountable for establishing a system whereby these objectives can best be achieved. Further, the statute recognizes that each individual school will be held accountable to the State Board for its performance. Also reflective of this structural approach are the mandates of KRS 158.6455 which require the State Board to "establish a system of determining successful schools and dispensing appropriate rewards." Nowhere do these statutes indicate absolute approval authority will rest with the State Board.

While the question before this court does not address the division of responsibility that exists between the state and local levels, the principles inherent to this division continue throughout the remaining statutory framework. The concept of decentralized decision making ability continues down to the individual local school councils and their relationships to the local school board. This is the question before this Court. We will directly address that issue now.

The third participant to whom the General Assembly has delegated responsibility is the local school board, whose general powers and duties are found at KRS 160.290. "Each board of education shall have general control and management of the public schools in its district." KRS 160.290. Later language of the provision clearly identifies what is meant by "general control and management" including "control and management of all school funds and all public school property," "appoint[ment of] the superintendent," and "fix[ing] the compensation of employees." *Id. See also, Chapman,* at 235–6.

Conspicuously absent from these listed powers is any suggestion that the District School Board is responsible for setting school policy at individual schools within the district. Rather, the nature of the duties enu-

merated suggests that the powers delegated to the local board of education are reflective of those with which a district wide body should be concerned. The General Assembly has reasonably determined that the management of funds that are distributed at a district level is most effectively addressed by a body consisting of representatives from the entire district. The hiring of a Superintendent of Schools for the district should be managed at the district level, so the legislature put the responsibility there. Fixing the compensation of employees within the same locality also most effectively rests at the district wide level. The point is clear that the legislature delegated to the district wide school boards the authority to handle the matters most relevant to its representative body, primarily managing funds, property, and district wide personnel decisions.

Keeping in mind that decentralization of authority and the development of school-based decision making are two primary objectives of KERA, the statutory delegation of authority to the school councils completes the requisite framework. The school councils are the focal point of decision making for the individual schools within the district. The council's body consists of members of that representative group only. Therefore, these people are charged with focusing on issues relevant to that school alone.

KRS 160.345 continues this part of the framework. The local board of education is mandated to adopt a policy for "implementing *school-based decision making* [that] . . . . allow[s] the professional staff members of a school to be involved in the decision making process as they work to meet educational goals established" pursuant to KRS 158.645 and 158.6451. KRS 160.345(2). The obvious intent here is to have the decisions affecting the individual schools within the district to be made by persons most affected by what occurs at that school; this is what "school-based *decision making*" means.

The statute provides the mechanism by which this is to occur, the school council. KRS 160.345 reads "[e]ach participating school *shall* form a school council." (emphasis added). "The school council *shall have the responsibility* to set school policy . . .

which shall provide an environment to enhance the students' achievement and help the school meet the goals established by KRS 158.645 and 158.6451." *Id.* (emphasis added.) This delegation of authority by the General Assembly to the School Council is clear.

■ However, the extent of that delegated authority is clouded by some language within the same provision that has been purposefully omitted from the above discussion. We will address that issue now. The provision actually reads: "[t]he school council shall have the responsibility to set school policy *consistent with district board policy* . . . ." KRS 160.345(2)(c) (emphasis added). The Board contends that this language indicates the Board has been granted oversight authority of the Council's actions. The Board states that this is the statutory basis for the approval of Council actions required in its policy.

The Board also raises the language of KRS 160.345(3)(g) which states that the Board's policy implementing school-based decision making shall include a provision for waiver of district policy. The Board further suggests that this provision can only mean that the Council is subject to the authority of the Board.

Although these provisions arguably may appear to place absolute oversight authority of Council actions within the hands of the local boards, we cannot give this interpretation to the statute in consideration of the overall framework of KERA. As we have discussed, decentralization is a primary objective of KERA. In limiting Council actions by requiring Board approval of all Council actions, there is no further decentralization. A closer look at other subsections of KRS 160.345 provides us with further insight into the General Assembly's intended limits of delegated authority.

First, KRS 160.345(4) states that "*[i]n addition to the authority granted to the school council* [by the legislature] the local board may grant to the school council any other

authority permitted by law."[2] This language clearly indicates that the school council has been delegated its own independent authority from the legislature that is not the product of district policy as suggested by the Board.

The language "consistent with district board policy" does not indicate any statutory basis for approval authority. Rather, the language ensures consistency among all schools of the Commonwealth and places administrative limitations on the actions of the Council in areas such as funding, salaries, and personnel decisions, where consistency would be an issue and where the authority for these district wide decisions has been delegated to the School Boards.

This language merely indicates that there are limits on what the Council can do. These limits, however, are not a result of legislatively delegated approval authority to the Local Boards. Rather, they are limits that were inherently created by the General Assembly in its delegations of authority to the participating groups in the common school system other than the local boards. KERA is designed to ensure that each participating group is responsible for that area of the school system most relevant to its representative body. This language requiring consistency with district board policy is directed at devising a system where "[t]he cooperation of all involved ... [is facilitated so] ... desired outcomes are achieved." KRS 158.645.

Within this context it is clear to this Court that these are also the reasons for the waiver requirement of KRS 160.345(3)(g). The legislature provided this waiver requirement to enable the school council to ask for a deviation from district policy, if it determines that the needs of that individual school would best be met in a manner different than that devised by the local board. For example, funding needs may require a divergence from district policy. Or, students from a particular region of the county may be found to need to focus on a different academic area than those developed by the local board objectives. The waiver provision is present to

enable flexibility, not to indicate approval authority by the Board over Council policy development.

In order to best understand the use of these provisions and the need for the language about being "consistent with district policy," we must recognize those areas where the school board's and the school council's delegated authority may overlap and the need for waiver or consistency may become an issue.

The statutes clearly indicate what the authority of the school council is. KRS 160.345(2)(i) lists important areas of responsibility, including the following:

(1) determination of curriculum, including needs assessment and curriculum development;

(2) Assignment of all instructional and noninstructional staff time;

(3) Assignment of students to classes and programs within the school;

(4) Determination of the schedule of the school day and week, subject to the beginning and ending times of the school day and school calendar year as established by the board;

.    .    .    .    .

(6) Planning and resolution of issues regarding instructional practices;

(7) Selection and implementation of discipline and classroom management techniques, including responsibilities of the student, parent, teacher, counselor and principal;

.    .    .    .    .

KRS 160.345(2)(f) also provides clear direction as to the intended authority of the school council and reads as follows:

After receiving notification of the funds available for the school from the local board, *the school council shall determine, within the parameters of the total available funds*, the number of persons to be employed in each job classification at the school. The council may make personnel

---

**2.** The delegation of authority *by the legislature* is clearly seen in the language of KRS §§ 160.345(2)(c), (f), & (g). Respectively, they read: "[t]he school council shall have the re-

sponsibility...."; "[t]he school council shall determine...."; and "[t]he school councill shall determine...."

decisions on vacancies occurring after the school council is formed but shall not have the authority to recommend transfers or dismissals. (emphasis added.)

KRS 160.345(2)(G) further defines the authority of the school council as follows:

*"The school council shall determine which textbooks, instructional materials, and student support services shall be provided in the school.* Subject to available resources, the local board shall allocate an appropriation to each school that is adequate to meet the school's needs related to instructional materials and school-based student support services, *as determined by the school council."* (emphasis added.)

This statutory language is helpful in understanding the interaction intended between the school council and the school board. KRS 160.345(2)(G) clearly indicates that it is the responsibility of the council to determine the textbooks, materials, and student services that will be provided in that particular school. The local board is *directed* to allocate funds that will enable the school to provide the materials and services determined necessary by the council. The primary limitation on the council's ability to determine what is to be acquired is the availability of resources. The resources that are available would be determined by district policy. This is a prime example of where the language "consistent with district policy" would become operative. Further, if the council believes additional funding would be necessary, the ability to request a waiver enables the needed flexibility. This is one area where approval by the Board would be necessary, and it is statutorily based in KRS 160.345(3)(g).

KRS 160.345(3)(f) further illustrates this interaction between the two groups. The statute directs that after the school council has received notification of available funds from the school board, the school council is able to determine the personnel it finds necessary within the school. The limitations on the council, however, are found in KRS 160.290, which reflects the delegated authority of the Board. As previously noted, the statute indicates that the Board shall "fix the compensation of employees." Therefore, while the council can determine the number of persons to be employed in each classification, it cannot determine the compensation of these employees. Once again, however, this is a situation where a waiver request may be useful in enabling flexibility.

## CONCLUSION

The above examination of these statutes clearly convinces this court that each participating group in the common school system has been delegated its own independent sphere of responsibility. State government is held accountable for providing adequate funding and for the overall success of the common school system. The local boards are responsible for the administrative functions of allocating funding, managing school property, appointing the superintendent, and fixing the compensation of employees. The councils are responsible for the site based issues, including but not limited to, determining curriculum, planning instructional practices, selecting and implementing discipline techniques, determining the composition of the staff at the school, and choosing textbooks and instructional materials.

The areas where these functions unavoidably overlap are primarily where funding issues may be in question. The waiver provision and the requirement of maintaining consistency with district policy are intended to ensure that the council acts within its available resources but is provided a needed avenue to request flexibility.

We recognize that this holding may appear to decrease significantly the authority of the local boards, however, the General Assembly created this statutory framework in response to recognized mismanagement of school systems. Several incidents that have reflected poorly upon the management of school systems have been before this Court. The record in *Rose* clearly evidenced the fact that the common school system suffered from problems associated with nepotism, favoritism, and misallocation of school funds. *See Rose,* at 193. Another case recently before this Court, *State Bd. For Elementary Educ. v. Ball,* Ky., 847 S.W.2d 743 (1993), also evidenced the improper activities by the local boards occurring in some school districts.

With the enactment of KERA, the General Assembly has designed a common school system that can effectively eliminate these distasteful incidents from occurring. The General Assembly has achieved this by devising a framework whereby the self interests of participating individuals making pertinent decisions are motivated by the desire for a strong educational system and not by financial gain and political success.

We, therefore, uphold the ruling of the Court of Appeals in result only. The legislature did not delegate the authority to the local boards of education to require approval of council actions.

LEIBSON, REYNOLDS and STUMBO, JJ., concur in this opinion.

WINTERSHEIMER, J., concurs by separate opinion.

LAMBERT, J., dissents by separate opinion in which SPAIN, J., joins.

WINTERSHEIMER, Justice, concurring.

I must concur with the result achieved by the majority opinion because such a result is compelled by any careful reading of the statutes. However, I wish to express my views separately.

The General Assembly enacted the lengthy and detailed Kentucky Revised Statutes known as the "Kentucky Education Reform Act" and created some totally new responsibilities, new units of authority and new lines of accountability in the state school system. KRS 158.6451; KRS 160.290; KRS 160.345. KERA also continued and expanded many of the statutes already in existence.

When the dimensions of the changes required by KERA are more widely understood, there may be additional tensions in the system as a result. The only proper role for the court is to interpret the statutes as written by the legislature. It should also be understood that the proper role of the General Assembly is to provide any prudent changes which it believes necessary.

In resolving differences between the councils and the local school boards we must understand the nature of each entity under the KERA system. The councils relate to public education through a day-by-day direction of individual schools. The local school board is still a vital element in the system by providing the unity of a learning process through board guidelines for the administration of the entire district. The responsibility of the local council is to set school policy consistent with district policy. KRS 160.345. The council and the board are separate entities. The citizens and voters as a whole elect board members to represent the entire community. The council members are chosen by school-based parents, teachers and the principal. Elected school board's actions are held accountable to the majority of the entire district. Council activities are accountable to the individual school-site community.

This lawsuit was filed seeking a declaration of rights between differing educational units and the interpretation of such interests. The majority opinion correctly applies the law as it was written by the General Assembly. Those who genuinely believe that KERA is defective, either in whole or in part, should take their concerns to the General Assembly which has a hearing process through both its regular and interim committee system open to all citizens of the Commonwealth.

Our system of public education may not be perfect because every human institution could stand improvement. Certainly adjustment is always possible and there should be continuing attention to the details of education. Change alone is not enough; improvement must be the result. Improvement of the public educational system for the benefit of the students is a legitimate concern of all parents, classroom teachers and other educators as well as the taxpayers as a whole. There is a common constitutional goal of an efficient system of public education which unites all Kentuckians both friend and foe of the current system. Cooperation and tolerance of all views should be encouraged in order to reach the goal.

LAMBERT, Justice, dissenting.

Contrary to the tenor of the majority opinion, only a most pedestrian issue appears here. That issue is whether the language of

KRS 160.345(2)(c) permits a district board of education to require its prior approval of school policies established by the school council.

> The statute in question is as follows:

> The school council shall have the responsibility to set school policy *consistent with district board policy* which shall provide an environment to enhance the students' achievement and help the school meet the goals established by KRS 158.645 and 158.645(1). (Emphasis added.)

In reliance upon this statute, appellant, the Board of Education of Boone County, Kentucky, adopted a policy which required each school council to submit for its review and approval the council's school year goals and objectives, its implementation plans, and its method of evaluation. Objecting to the board's policy on grounds that it was ; ! to act autonomously, the council sought declaratory and injunctive relief.

In my view, the language of the statute grants the district board of education a right of prior approval of school council policies. The majority virtually admits this to be so (at 814-15), but finds a greater meaning in the "framework of KERA" by which to avoid the plain language of the statute. Such an approach is at odds with the accepted methodology of statutory construction as it is well described in *Gateway Construction Co. v. Wallbaum*, Ky., 356 S.W.2d 247, 249 (1962):

> The best way in most cases to ascertain such intent or to determine the meaning of a statute is to look to the language used, but no intention must be read into the statute not justified by the language. The primary rule is to ascertain the intention from the words employed in enacting the statute and not to guess what the Legislature may have intended but did not express. (Citations omitted.

The majority has gone far beyond that which is necessary to decide this case and delivered an analytical treatise on the Kentucky Education Reform Act. As tempting as it is to attempt definitive writing in cutting-edge areas of law, we should stick with the issue and decide no more than is necessary for the case. Here, we must determine

what meaning shall be ascribed to the statutory language quoted hereinabove and in my view, that language is too plain to permit the result achieved by the majority.

For these reasons, I dissent.

SPAIN, J., joins this dissenting opinion.